IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Margaret Daniels Law, | ) | C/A No.: 1:12-1502-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February
14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for
Commissioner Michael J. Astrue as the defendant in this lawsuit.

## I.    Relevant Background

### A.    Procedural History

On February 20, 2009, Plaintiff filed an application for DIB in which she alleged her disability began on September 19, 2002.  Tr. at 131.  Her application was denied initially and upon reconsideration.  Tr. at 50, 53.  On September 1, 2010, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Karen A. Cornick.  Tr. at 29–49 (Hr'g Tr.).  The ALJ issued an unfavorable decision on September 23, 2010, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 12–23.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 5, 2012.  [Entry #1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 54 years old at the time of the hearing.  Tr. at 33.  She completed high school and three years of college.  Tr. at 34.  Her past relevant work ("PRW") was as a retail store manager and as a shipping and receiving clerk.  Tr. at 45.  She worked for Long's Drug Store from 1986 until September 2002.  Tr. at 681.  She alleges she has been unable to work since September 19, 2002.  Tr. at 131.

2.    Medical History

In June 2002, Plaintiff was injured at work when a stack of chairs fell and hit her on the right shoulder and hand.  Tr. at 345.  On September 19, 2002, she suffered another work-related injury when a case of wine fell on her head and right shoulder.  Tr. at 409–10, 681; *see also* Tr. at 228.  Following an MRI of her neck, which revealed a bulging disc, facet arthritis, and foraminal narrowing (Tr. at 464–65), Plaintiff underwent cervical fusion surgery (at the C6–7 level) in February 2003.  Tr. at 382–84; *see also* Tr. at 228, 319, 324, 378–81, 389.  Treatment records indicate the surgery was initially successful in relieving some of her symptoms.  *See, e.g.*, Tr. at 228, 455, 499.  However, Plaintiff claims that her symptoms returned a few months later with frequent swelling of the right hand with any repetitive activity, loss of strength and mobility in her right hand and wrist, and pain in her neck, shoulder, and head.  Tr. at 228.  She received follow-up treatment for her continued neck-related complaints from Steven Patwell, M.D., an occupational health specialist (*see, e.g.*, Tr. at 437–38, 444–45, 447–50, 461–62) and from Lorraine Tortosa, M.D., a primary care physician (Tr. at 499–500).  Dr. Patwell characterized the condition related to Plaintiff's cervical spine complaints as a significant deterioration.  Tr. at 444.  Plaintiff also engaged in physical therapy, which was noted to improve her symptoms.  Tr. at 227–30, 436.

In May 2003, on referral from Dr. Patwell, Plaintiff saw Christopher Damon, M.D., a hand surgeon who examined her and found that she had a symptomatic carpal boss of the right hand.  Tr. at 324–26, 457.  Plaintiff reported that although she had some

improvement in neck and arm pain following her cervical fusion, she continued to have pain in her forearm and occasional tingling and numbness in her right hand.  Tr. at 324. Dr. Damon counseled Plaintiff on available treatments, including surgery, but advised her of the possibility of incomplete relief with surgery.  Tr. at 326.  He advised her to continue at light stress activities with her right upper extremity; to avoid repetitive, heavier stress activities; and to limit her maximum lifting, gripping, pushing, and pulling to 15 pounds.  Tr. at 326.  Plaintiff opted for surgery (Tr. at 326, 451–54), which was performed in July 2003 (Tr. at 314–42, 370–71).  Two weeks later, she had regained full range of motion of her fingers and wrist, but reported pain in her index and middle fingers.  Tr. at 446.

From October to December 2003, Plaintiff underwent occupational therapy for her hand (Tr. at 347–69, 430) and had a series of injections in her neck (at the stellate ganglion) (Tr. at 233–313).  A November 28, 2003, progress note from Brett Mathieson, M.D., a pain specialist, indicated that the injections had been successful and that Plaintiff's mobility was improving with physical therapy, but that she was still in moderate to severe pain.  Tr. at 298.

During this same time period, Drs. Damon, Patwell, and Mathieson noted that Plaintiff had Reflex Sympathetic Dystrophy ("RSD").[2]  Tr. at 298, 433–34, 437–38, 509–

---

[2] RSD (also known as Chronic Regional Pain Syndrome ("CRPS")) "is a chronic pain syndrome most often resulting from trauma to a single extremity" that manifests due to abnormal sympathetic nervous system function. Diagnostic criteria for RSD/CRPS include "persistent, intense pain that results in impaired mobility of the affected region,"

4

10.  Dr. Damon restricted Plaintiff to light stress activities with the right upper extremity and no restrictions to the left.  Tr. at 433.  Subsequent x-rays and an MRI of the right shoulder showed mild osteoarthritic changes of the acromioclavicular joint (joint at the top of the shoulder).  Tr. at 427–29.

From November 2003 to January 2004, Plaintiff complained of pain in her right hand, right arm, and upper back pain, and said the injections in her neck were not that helpful.  Tr. at 425–26, 492–95.  Dr. Patwell opined that Plaintiff should avoid repetitive overhead reaching with the right arm.  Tr. at 431–32.

In February 2004, Dr. Patwell opined that Plaintiff had reached maximum medical improvement ("MMI") with maximum benefit from medical interventions.  Tr. at 424.  He discussed with Plaintiff that she was going to have a chronic problem that should be watched in future years for changes.  *Id.*  Dr. Patwell found that Plaintiff was eligible for vocational rehabilitation so she could perform a modified version of her current job or a different job.  *Id.*  Plaintiff continued to receive treatment from Drs. Tortosa and Damon from February to April 2004, and was ultimately referred to a pain clinic.  Tr. at 422–23, 490–91.

Plaintiff saw pain specialist Michael Levin, M.D., in late April 2004.  Tr. at 681–85.  He noted that the stellate ganglion injections had not lasted longer than 48 hours and

---

along with swelling, autonomic instability (changes in skin color or texture, changes in sweating, skin temperature changes, or "gooseflesh"), abnormal hair or nail growth, osteoporosis, or involuntary movements.  *See* Social Security Ruling (SSR) 03-02p, 2003 WL 22399117.

some of them numbed her entire arm and sometimes her leg.  Tr. at 681.  Plaintiff reported that she was unable to wear rings or a watch on her right hand and stated that her pain averaged an eight out of 10.  *Id.*  On examination, Plaintiff had obvious swelling in her right wrist, hand, and fingers, but her color and temperature were normal.  Tr. at 683.  Plaintiff had limited range of motion in her right shoulder and wrist and decreased strength in her right hand.  *Id.*  Dr. Levin discussed Plaintiff's CRPS diagnosis and recommended aggressive physical therapy, medications, and vocational rehabilitation.  Tr. at 685.  He told Plaintiff that she could "participate in any activity she desires to, and that it may hurt more, but she is not doing any damage to her arm and the more she uses the arm, the better off she will be."  *Id.*

In May and June 2004, Dr. Damon noted that medications had been of limited benefit for Plaintiff's RSD, and that she continued to be restricted to light stress activities (including a limit of 10 pounds with the right upper extremity).  Tr. at 420–21.  Examinations showed some mild swelling and tenderness, but full or good range of motion of the fingers.  *Id.*  Plaintiff continued to receive treatment from Dr. Levin and Dr. Damon.  Tr. at 418–19, 679–80, 686–87.  On June 29, 2004, Dr. Levin noted that Plaintiff was having a "very rocky" response to her medications, was depressed with suicidal thoughts, and was pinning her hopes on the spinal cord stimulator.  Tr. at 679.

On August 19, 2004, Plaintiff underwent implantation of a temporary spinal cord stimulator.  Tr. at 402–03.  On August 24, 2004, Dr. Levin noted that Plaintiff had

excellent relief with the stimulator and could write easily with her affected hand.  Tr. at 675; *see also* Tr. at 523 (stimulator working well).

On October 21, 2004, Dr. Damon noted that Plaintiff's response to the temporary stimulator was excellent, but that she had some flare ups that caused her pain.  Tr. at 415. He observed that Plaintiff had peeling skin and burning paresthesia to light touch on her fingertips, but no discoloration or swelling.  *Id.*  Likewise, Dr. Tortosa noted that Plaintiff had a good response to the stimulator.  Tr. at 483–84, 487–88.  Plaintiff was treated for a headache and some neurological symptoms in November 2004 and was diagnosed with a possible transient ischemic attack.  Tr. at 377, 483–86, 515–17, 620–21, 659, 672.

Plaintiff underwent a procedure to have a permanent spinal cord stimulator implanted in December 2004.  Tr. at 400–03.

As of January 2005, Plaintiff had been able to stop taking most of the medications she was taking before a stimulator was implanted.  Tr. at 521.  At that time, Dr. Levin noted that she had good range of motion of her neck and slight limitation of motion and strength in her right hand.  *Id.*

In March 2005, Plaintiff saw Wenchiang Han, M.D., a neurologist for complaints of left-sided numbness paralysis, which she said began on November 20, 2004.  Tr. at 404.  She stated that these episodes always ended with a headache and noted a history of migraine headaches occurring once or twice a year.  *Id.*  Dr. Han noted that the spinal cord stimulator was working pretty well and that Plaintiff had been able to get off some

of her medications.  *Id.*  He also noted that she was a student at Yuba College in a pre-law course and opined that her episodes were likely migraine-related.  Tr. at 405–06.

On March 29, 2005, Plaintiff followed up with Dr. Damon, who noted that the spinal cord stimulator helped a lot, but that Plaintiff still had some breakthrough pain and requested a mild pain medication.  Tr. at 414.  Dr. Damon observed no overt signs of RSD and a full range of motion in Plaintiff's wrist and fingers.  *Id.*

In April 2005, Dr. Damon competed a final evaluation of Plaintiff's condition.  Tr. at 411.  He noted that she did well until about three months following her carpal boss surgery when she developed increasing pain in her right hand that developed into full-blown RSD.  *Id.*  Dr. Damon found that Plaintiff was "permanent and stationary" with moderate symptomology associated with her chronic RSD.  Tr. at 412.  He assessed a 45 percent whole-person impairment rating.  *Id.*  He noted that Plaintiff was undergoing work retraining on her own accord and continued to be limited to light use of her right arm with maximum lift, grip, push, and pull of 10 pounds nonrepetitively.  *Id.*

In October 2005, Plaintiff saw orthopedist John Branscum, M.D., for an evaluation.  Tr. at 529–53.  After an extensive summary of Plaintiff's medical records, Dr. Branscum noted that Plaintiff had been approved for vocational rehabilitation.  Tr. at 544.  He also noted that she had started school (to become a paralegal) in January 2005, but had to stop because her husband's job transferred him to another city.  *Id.*  She said she planned to return to school after they were settled in their new location.  *Id.*  During the interview, which lasted more than an hour, Plaintiff stood up on two occasions due to

8

the pain in her neck, shoulder, and back.  Tr. at 546–47.  Dr. Branscum observed that Plaintiff walked slowly with no gait abnormalities, but held her arms slightly abducted because of the pain in her trapezius caused by walking.  Tr. at 547.  Plaintiff stated that she could not squat or walk on her heels or toes because of shoulder pain.  *Id.*  On examination, Plaintiff exhibited restricted range of motion in her neck, right shoulder, and spine.  Tr. at 547–48, 550.  Plaintiff had normal motor function and strength in her arms and normal range of motion in her wrists.  Tr. at 548.  Sensory examination revealed dysthesia in her right hand, arm, and neck, including numbness, tingling, and burning that was disturbing to Plaintiff.  Tr. at 549.  Dr. Branscum stated that Plaintiff "cannot do very much with her right hand" and, although she is able to use her left hand, uses that hand constantly to adjust her spinal cord simulator.  Tr. at 551.  He said he was not sure what Plaintiff could or could not do, but opined that she should not engage in prolonged posturing of the neck, heavy lifting, bending, or stooping; should be limited to very simple manipulation with her right hand for short periods of time; and that her back impairment precluded prolonged sitting or standing, bending, stooping, and lifting.  Tr. 552–53.  Dr. Branscum completed a form indicating that Plaintiff had a permanent impairment and could not return to her usual job.  Tr. at 714.

In February 2006, Plaintiff was evaluated by William Isgreen, M.D., a physiatrist and neurologist chosen by the defendant employer in her worker's compensation case. Tr. at 807–20, 832.  Plaintiff said she could not hold anything for any length of time with her right hand, but could use it to write.  Tr. at 811.  She said she used her nondominant

9

left hand for most of her endeavors, including dressing and putting on makeup.  *Id.*
Plaintiff stated that sometimes she could use her right arm for activities, but had to
protect it at other times.  *Id.*  She said she could drive up to a half an hour, walk up to a
half an hour, and shop with her husband, but would not lift even a gallon of milk with her
right hand.  Tr. at 811–12.  She said she was pleased overall with the results her surgery
and had been able to reduce her medications. Tr. at 812.  Dr. Isgreen stated that Plaintiff's
diagnosis of CRPS was not particularly well-established.  Tr. at 818.  He noted that
examinations of record had been consistently replete with internal inconsistences and
frank contradictions.  Tr. at 819.  He found that Plaintiff had normal range of motion of
her back, walked with reasonable fluidity, had no atrophy, and did not show signs of
RSD.  Tr. at 815–16.  He said that Plaintiff could use her right arm for self care and
handling tasks, as demonstrated by her ability to fill out a nine-page questionnaire.  Tr. at
819.   After discussing the various impairment ratings in the case (including Dr.
Seymour's (first name unknown) rating),[3] Dr. Isgreen assessed a 31 percent whole-person
impairment rating and noted she would be at a distinct disadvantage in the workplace.
Tr. at 819–20.  He also completed a form indicating Plaintiff had a permanent disability
and could not return to her usual job, with or without restrictions.  Tr. at 806.

   Plaintiff began seeing Peter Johnson, M.D., in April 2006, and continued to see
him routinely through late 2007.  Dr. Johnson noted Plaintiff's complaints, adjusted her
medications, and listed her diagnoses as RSD or CRPS.  Tr. at 564, 568, 571, 573, 575,

---

[3] Dr. Seymour's report is not in the record.

577, 580, 583, 584, 586, 588, 590, 592, 595, 596, 598, 600, 603, 605, 612.  In July 2006, he noted that Plaintiff was still looking for work and felt that she may have a position becoming available soon.  Tr. at 595.  In October 2007, Plaintiff reported that her pain was still very pronounced in her right upper extremity over the shoulder and down the arm with a feeling of heaviness in the forearm and elbow area.  Tr. at 568.

Plaintiff also received routine care from W. Dean Lorenz, M.D., beginning in October 2007.  Tr. at 559–61.  Plaintiff complained of an exacerbation of her symptoms over the prior months, including more swelling and throbbing, shaking, and an inability to use her right arm.  Tr. at 560.  Neck x-rays and a CT scan in December 2007—the month Plaintiff's insured status expired—were unremarkable except for evidence of Plaintiff's prior surgery.  Tr. at 744, 747–48.

On December 3, 2007, Plaintiff was evaluated by Michael Sommer, M.D. in connection with her worker's compensation claim.  Tr. at 773–85.  On examination, Plaintiff demonstrated reduced neck mobility and no grip strength with her right hand. Tr. at 779.  Plaintiff stated that she really could not do anything with her right hand because it caused her too much pain.  *Id.*  Dr. Sommer noted that Plaintiff's right upper limb was a bit cool compared to the left.  *Id.*  He stated that the date that Dr. Damon deemed Plaintiff permanent and stationary was the most appropriate and that some of her other doctors had made that determination too early.  Tr. at 782.

In May 2009, Daria Mullaney, M.D., a state agency physician, reviewed the record and opined as to Plaintiff's limitations prior to her date last insured in December 2007.

11

Tr. at 902–10.  Dr. Mullaney opined that Plaintiff could perform a reduced range of light work with limitations on the use of her right arm, including no sustained use of her right upper extremity and limited reaching, handling, and fingering.  Tr. at 903, 905.  Dr. Mullaney noted that although some doctors felt Plaintiff did not have CRPS, other treating sources had felt that she had the diagnosis and Plaintiff was, therefore, given the benefit of the doubt on that diagnosis.  Tr. at 907.  In September 2009, Elva Stinson, M.D., another state agency physician, reviewed the record and also opined that Plaintiff could perform a reduced range of light work with limitations on the use of the right arm prior to December 2007.  Tr. at 928–35.  Dr. Stinson opined that Plaintiff should be limited to occasional overhead work, frequent overhead reaching, and frequent handling and fingering with her right hand.  Tr. at 931.

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

              a.     Plaintiff's Testimony

At the hearing on September 1, 2010, Plaintiff appeared without representation.  Tr. at 31.  She testified that she last worked in 2002, after she was injured on the job.  Tr. at 34.  She stated that after having surgery, she still had difficulty using her hand, sitting, standing, and moving her neck.  Tr. at 35.  She said her activities prior to 2007 included caring for her personal needs, driving, running errands, going grocery shopping, putting groceries away, taking a nap, cooking dinner, cleaning up, making her bed, and sometimes doing dishes  Tr. at 35–36, 38–39.  She testified that her medications make her

12

drowsy, dizzy, and nauseous.  Tr. at 36.  She stated that her hand cramps if she writes for very long and estimated that she could sit and stand between 20 to 45 minutes at a time and lift 10 pounds.  Tr. at 36–37.  She said she saw and played with her grandchildren once or twice a year, but needed to have someone else with her in case her pain started to overwhelm her.   Tr. at 37–38.

Plaintiff stated that her CRPS was difficult to describe to someone who has never had it.  Tr. at 40.  She stated that some days she could be pain free long enough to do more than she normally would, but that she would pay for extra activity the next day by being unable to get up in the morning and shower.  *Id.*  She said that sometimes she cannot shower because the water falling on her feels like needles are being driven through her body.  *Id.*

Plaintiff stated that in her review of the records she received related to her claim, there seemed to be a lot of doctors who responded that they had no files on her visits.  Tr. at 39.  She maintained that she saw those doctors, but wondered whether they had moved or whether the passing of time meant that they no longer had her records.  *Id.*

b.    Testimony of Linda Kirby

Plaintiff's friend, Linda Kirby, testified on her behalf.  Tr. at 41.  Ms. Kirby stated that she has seen Plaintiff or talked to her on the phone every day since 2006.  Tr. at 41–42.  She said that there are days when Plaintiff is in so much pain that she cannot function at all.  Tr. at 42.  She testified that sometimes Plaintiff cannot grasp anything with her hand and has dropped things because she cannot hold onto them.  *Id.*  Ms. Kirby opined

13

that Plaintiff would not have been able to work in 2007 because Plaintiff never knows if she will be able to function until the morning comes and would not be dependable enough for employment.  Tr. at 43.  Ms. Kirby described Plaintiff as a smart and proud person who would be working if she could.  Tr. at 43–44.

### c.    Vocational Expert Testimony

Vocational Expert ("VE") Nancy Haywood reviewed the record and testified at the hearing.  Tr. at 44.  The VE categorized Plaintiff's PRW as a retail store manager as unskilled work and as a shipping and receiving clerk as medium skilled work.  Tr. at 45.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; sit and stand 20 to 45 minutes at a time; occasionally kneel, balance, crouch, and stoop; never climb ladders, ropes, or scaffolds; occasionally reach overhead; and frequently, but not constantly handle with the right hand.  *Id.*  The ALJ also noted that the hypothetical individual must have an alternating sit/stand option.  *Id.*  The VE testified that the hypothetical individual could not perform Plaintiff's PRW.  *Id.*  The ALJ asked whether there were any other jobs in the regional or national economies that the hypothetical person could perform.  Tr. at 46.  The VE identified the light, unskilled jobs of ticket taker, ticket seller, and small products assembler.  *Id.*  The ALJ then asked the VE whether there were jobs a hypothetical person could perform assuming the same limitations from the first hypothetical except that the handling and fingering would be occasional.  *Id.*  The VE identified the light, unskilled jobs of counter clerk and tanning salon attendant, and the sedentary, unskilled job of call-out operator.  Tr. at 47.  Upon

14

questioning by Plaintiff, the VE stated that someone who was able to work for two hours on Monday, then had to go home and could not come in on Tuesday would not be able to sustain ongoing competitive employment.  Tr. at 48.

### 2.     The ALJ's Findings

In her September 23, 2010, decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2.     The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 19, 2002 through her date last insured of December 31, 2007 (20 CFR 404.1520(b) and CFR 404.1571 *et seq.*).

3.     Through the date last insured, the claimant had the following severe combination of impairments: a history of neck injury and hand complicated by RSD, status post ACDF (discectomy) performed in 2003, mild carpal boss and excision, obesity and mild degenerative disc disease of the cervical spine (20 CFR 404.1520(c)).

4.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work.  Specifically, she can lift 20 pounds occasionally and 10 pounds frequently.  She is able to sit 20 to 45 minutes at a time, stand 20 to 45 minutes at a time, and will need the option to alternate between sitting and standing, as needed.  She can occasionally perform kneeling, balancing, crouching, and stooping.  She can never climb ladders, ropes or scaffolds or crawl and can perform tasks involving only occasional overhead reaching, and frequent handling and fingering on the right.

6.     Through the date last insured, the claimant was unable to perform her past relevant work (20 CFR 404.1565).

7.  The claimant was born on July 13, 1956 and was 51 years old, which is defined as an individual closely approaching advanced age 50–54, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from September 19, 2002, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

Tr. at 14–23.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  The ALJ failed to properly consider the opinion of the treating physicians;

2)  The RFC determination is not supported by substantial evidence; and

3)  The ALJ presented an incomplete hypothetical to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those]

17

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

18

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

> 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for

the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at

1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is

substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*,

483 F.2d 773, 775 (4th Cir. 1972).

      B.      Analysis

Plaintiff first argues that the ALJ erred in the weight she accorded to the opinions

of Plaintiff's treating and consulting physicians, including the opinions of Drs. Damon

and Branscum, and in failing to explain the weight given.  [Entry #17 at 3–7].  The

Commissioner fails to directly address whether the ALJ properly considered the opinions

of the physicians.  Instead, the Commissioner skirts the issue by arguing that the record

as a whole supports the RFC determination.  [Entry #18 at 11–12].  She further argues

that the RFC assessed by the ALJ is similar to or largely accounts for the limitations

opined by Drs. Damon and Branscum.  *Id.* at 12–13.

If a treating source's medical opinion is "well-supported and not inconsistent with

the other substantial evidence in the case record, it must be given controlling weight[.]"

SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2) (providing treating source's opinion

will be given controlling weight if well-supported by medically-acceptable clinical and

laboratory diagnostic techniques and inconsistent with other substantial evidence in the

record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's

opinion should be accorded "significantly less weight" if it is not supported by the

clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

It is undisputed that Dr. Damon was a treating physician. In April 2005, following implantation of Plaintiff's spinal cord stimulator, Dr. Damon assessed Plaintiff with a 45 percent whole-person impairment rating and limited her to light use of her right arm with maximum lift, grip, push, and pull of 10 pounds nonrepetitively. Tr. at 411–12. He

21

noted that Plaintiff had done well until about three months following her carpal boss surgery when she developed increasing pain in her right hand that developed into full-blown RSD and that she continued to have moderate symptomology associated with her chronic RSD. *Id.*

Several consulting physicians also rendered opinions about Plaintiff. Among them are Drs. Isgreen, Seymour, and Branscum. Drs. Isgreen and Branscrum each examined Plaintiff one time and their reports include extensive summaries of her medical records. Tr. at 529–53, 807–20. Dr. Seymour ostensibly examined Plaintiff, although his evaluation is not in the record and the only mention of his opinion is in Dr. Isgreen's evaluation. Tr. at 820.

After setting forth the opinions of Drs. Damon, Isgreen, and Seymour, the ALJ stated as follows:

> The undersigned . . . accords greater weight to Dr. Isgreen's opinion because it is based on a comprehensive review of the claimant's medical records (covering the period May 7, 2002 to November 10, 2005), findings on physical examination and medical research. Less weight is accorded to the opinion of Dr. Damon and great weight is accorded to the opinion of Dr. Seymour.

Tr. at 20 (internal citation omitted). The ALJ went on accord "some weight" to Dr. Branscum's opinion of October 2005 limiting Plaintiff's ability to sit and stand. *Id.*

The ALJ failed to provide any explanation as to why she was according little weight to the opinion of Dr. Damon, the only treating physician, except to say that Dr. Isgreen noted that Dr. Damon's examination "had been consistently replete with internal

22

inconsistencies and frank contradictions." *Id.* Neither the ALJ nor Dr. Isgreen identified the alleged inconsistencies and contradictions with specificity. In addition, Dr. Isgreen's opinion appears to state that the examination of Plaintiff in general had been replete with inconsistencies and contradictions, not that Dr. Damon's examination of Plaintiff reflected those problems. Tr. at 819. In any event, the undersigned recommends a finding that this single reason given for discounting the opinion of a treating specialist is insufficient and that the ALJ failed to properly articulate why Dr. Damon's opinion should not be given controlling weight.

Although the ALJ's failure to adequately consider the opinion of Dr. Damon alone warrants remand, there are other problems with the ALJ's treatment of the physicians' opinions. First, the ALJ inexplicably accorded great weight to an opinion that is not in the record. Second, the ALJ failed to explain why she accorded Dr. Isgreen's opinion more weight than that of Dr. Branscum, other than to generally state that the objective findings show that Plaintiff would only be restricted in lifting and overhead work, rather than in sitting and standing as opined by Dr. Branscum. Tr. at 20. The ALJ stated that he accorded great weight to Dr. Isgreen because of his comprehensive review of the medical records, findings on physical examination, and medical research. Dr. Branscum's evaluation was arguably even more comprehensive than that of Dr. Isgreen, and the ALJ failed to sufficiently explain why he accorded more weight to one consultant over another.

The undersigned is not persuaded by the Commissioner's argument that the limitations opined by Drs. Damon and Branscum are "not that different" from the ALJ's RFC determination. [Entry #18 at 12]. The ALJ did not articulate this in her decision and her finding that Dr. Damon's opinion should be given less weight contradicts the Commissioner's argument. Consequently, the post-hoc rationalization offered by the Commissioner does not remedy the deficient analysis by the ALJ. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Furthermore, the undersigned finds that the ALJ's determination that Plaintiff could perform light work directly contradicts Dr. Damon's opinion that she could lift, grip, push, and pull no more than 10 pounds nonrepetitively.

For the foregoing reasons, the undersigned recommends remand based on the ALJ's failure to properly evaluate the opinions of Plaintiff's treating and consulting physicians.

Plaintiff also argues that the ALJ's RFC determination was faulty and that the hypothetical presented to the VE was incomplete. Because the ALJ's failure to properly consider the opinions of the physicians necessarily affects the RFC assessment and hypothetical, the undersigned recommends a finding that the RFC determination and hypothetical are not supported by substantial evidence.

24

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 9, 2013                                    Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).